IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| **Karen Fitzgerald** | ) |
| | ) |
|     Plaintiff, | ) |
| | ) |
|  v. | )   No. 11 C 388 |
| | ) |
| **Officer M. Santoro, et. al,** | ) |
| | ) |
|     Defendants. | ) |
| | ) |

## MEMORANDUM OPINION AND ORDER

Plaintiff has sued the Village of Schaumburg, two individually identified police officers, and one individually identified paramedic asserting claims pursuant to 42 U.S.C. § 1983 for unlawful entry, unlawful seizure, and excessive force, and state law claims for battery and intentional infliction of emotional distress. Now before me is defendants' motion for summary judgment on all of these claims, which I grant for the reasons that follow.

I.

In the early morning hours of February 6, 2010, the individual defendants responded separately to dispatch calls stating that an intoxicated female caller had contacted the Palatine Police Department, and, in what plaintiff herself characterizes as an "unfocused and rambling" call, made statements that the desk officer interpreted as suggesting that she was "very depressed" and possibly

1

suicidal. After ascertaining plaintiff's identity and home address based on information she provided during the call, the Palatine desk officer contacted dispatch to request that officers be sent to plaintiff's home for a well-being check.[1] Defendant Officers Santoro and Cram and defendant paramedic Ashcraft were then dispatched to plaintiff's building, where they entered without a warrant, and, I will assume, without her consent.[2] Both officers were familiar with plaintiff at the time, having responded to several previous calls to her residence, including on one occasion in which plaintiff had injured herself--apparently without realizing it--and had required hospitalization.[3]

---

[1] The parties sought, and were granted, leave to file compact discs containing recordings of plaintiff's call to the Palatine Police (which also includes the Palatine Desk Officer's call to dispatch) (Exh. 8 to Pl.'s Stmt. Of Facts), and radio dispatch transmissions between the defendant officers and Northwest Central Dispatch (Exh. E to Def.'s Stmt. Of Facts). I have listened to both cds.

[2] Defendants claim that they rang the door bell for plaintiff's unit at the entrance to her building and were "buzzed in," but plaintiff disputes that she either heard the door bell or granted the officers entry. According to plaintiff, when the officers reached her unit, they forced their way in as she was turning the doorknob. Exhibit E to defendants' L.R. 56.1 Statement supports their assertion that the officers rang plaintiff's doorbell, but I nevertheless accept plaintiff's version of their entry into her residence.

[3] The parties do not include details of the previous occasion in their L.R. 56.1 factual statements, but both parties cite to the testimony of Officer Cram, who responded to the previous call, in which he stated that on that occasion, plaintiff had called the police to report that someone had broken into her residence and left muddy footprints. Officer Cram explained that upon his arrival at plaintiff's residence on that occasion, he

2

At the time defendants entered plaintiff's home on the night in question, her speech was slurred and her gait unsteady, and a glass of wine was on the table nearby, all of which led defendants to conclude that plaintiff was, indeed, heavily intoxicated. Plaintiff admits that she had drunk at least two glasses of wine in the hour-and-a-half preceding defendants' arrival; that she had eaten nothing for the previous twenty-four hours; and that she had not slept in three days. Defendants spent approximately thirty minutes talking to plaintiff about her condition and how she was feeling. Asked about her call to the Palatine Police Department, plaintiff denied that she had said she was suicidal, but she admitted that she had been "very aggravated by a number of things," including that her ex-boyfriend had obtained an order of protection against her, and wanted to talk to someone about her problems.

Confronted with plaintiff's denial of suicidal thoughts or statements, Officer Santoro stepped out of plaintiff's home and called dispatch to confirm that she had, indeed, made such statements to the Palatine desk officer. After receiving confirmation, Officer Santoro returned to plaintiff's residence,

---

determined that the footprints were, in fact, plaintiff's own, bloody, footprints, which she had left throughout her home after stepping in glass. Officer Cram further testified that plaintiff's degree of intoxication on that occasion--which he characterized as "extreme[]"--appeared to be "pretty comparable" to her degree of intoxication on February 6, 2010. Cram Dep., Exh. D to Def.'s L.R. 56.1 Stmt., 14:11-15, 12:21-13:18.

3

conferred with Officer Cram and the paramedics,[4] and decided that plaintiff should be taken to a hospital for evaluation. Plaintiff refused to accompany them voluntarily. Defendants suggested that, alternatively, plaintiff could call a friend to stay with her at home, but plaintiff was unable to reach anyone.

Ultimately, defendants forced plaintiff to accompany them to the hospital. Officers Santoro and Cram each took one of plaintiff's arms and escorted her to, then placed her on, a gurney. Plaintiff resisted these efforts by pulling away from the officers and screaming at the top of her lungs. Officer Santoro used a "wrist lock" to control plaintiff's right arm, while Officer Cram held plaintiff in an "arm bar escort" position.[5] Plaintiff's right wrist was then handcuffed to the gurney, and her body was secured with straps for transport by ambulance to the hospital.

Once inside the ambulance, plaintiff attempted to free her right hand from the handcuff and to unstrap the security straps, then sat up in an effort to get off the gurney.[6] Officer Cram moved

---

[4]Two paramedics were present, but only one is a defendant in this action.

[5]Officer Cram explained, and plaintiff does not dispute, that in a "wrist lock," the officer holds the subject's wrist and bends her hand downwards in a ninety-degree angle towards the palm. In an "arm bar," the officer takes the subject's wrist in one hand and places the other hand above the subject's elbow. The arm is then rotated forward and pulled back to prevent the subject from bending the elbow and shoulder joints.

[6]Taking the evidence in the light most favorable to plaintiff, there is a dispute over whether plaintiff was

4

to secure plaintiff, who continued to struggle, by placing her right hand in a wrist lock with his right hand while reaching back for his handcuff key with his left. According to defendants' uncontroverted evidence, plaintiff then placed her left hand on her right forearm and forcefully jerked or "torqued" her body away in attempt to free herself from Officer Cram's grasp. Cram Dep., Exh. D to Def.'s L.R. 56.1 Stmt., 32:3-6. At that point, a "popping," or "snapping" sound could be heard in plaintiff's wrist. *Id*., 32:6; Fitzgerald Dep., Exh. 2 to Pl.'s L.R. 56.1 Stmt., 163:4-5. Plaintiff claims to have no recollection of jerking her hand away in the manner defendants describe, but she agrees that she "probably" did so. Fitzgerald Dep., Exh. 2 to Pl.'s L.R. 56.1 Stmt., 160:21-161:2.

After the "popping" sound was heard, plaintiff calmed down, was given an ice pack for her wrist, and was transported to the emergency room at St. Alexius Hospital. A hospital report that plaintiff includes in her L.R. 56.1 submissions identifies "depression" as her "chief complaint" on admission but states that plaintiff "denies any suicidal or homicidal ideation." Exh. 3 to Pl.'s L.R. 56.1 Stmt.

---

successful in freeing herself from the handcuff. Plaintiff testified that although she "wriggled" and "pulled" in attempt to free her hand from the cuff, she was not able to do so, while Officer Cram testified that she had, indeed, removed her hand from the cuff. This dispute is not material to defendants' motion, however, since, as discussed below, plaintiff does not controvert defendants' evidence that the only force applied by the officers at that point was Officer Cram's use of a wrist lock.

5

II.

Summary judgment is proper where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). A genuine issue of material fact exists if "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

Turning first to plaintiff's § 1983 claims, I conclude that plaintiff has not raised a triable issue as to whether defendants violated the constitutional rights she asserts because they had probable cause both to enter her residence and to commit her involuntarily, and because, on the undisputed evidence, the force they used to seize her was no greater than was necessary. Moreover, I conclude that even if probable cause for defendants' entry and seizure were lacking, they are entitled to qualified immunity on plaintiff's § 1983 claims.

Although, as a general rule, warrantless entry into a home is *per se* unreasonable, an "exigent circumstances" exception exists when law enforcement officers "reasonably believe a person within is in need of immediate aid." *U.S. v. Richardson*, 208 F.3d 626, 629 (7th Cir. 2000). To ascertain whether the exigent circumstances doctrine applies, I must "analyze the situation from the perspective

of the officers at the scene" and ask whether they had "an objectively reasonable belief that exigent circumstances existed." *United States v. Marshall*, 157 F.3d 477, 482 (7th Cir. 1998).

At the time defendants entered plaintiff's home, the information they possessed included dispatch reports that an intoxicated, "very depressed" individual residing at plaintiff's address had called the Palatine Police Department and made statements that the desk officer interpreted as suicidal. Moreover, the officers were familiar with plaintiff from previous contacts with her while she was intoxicated, and Officer Cram, in particular, knew that she had, on one such occasion, injured herself unwittingly. Plaintiff does not deny that the dispatcher to whom Officer Santoro spoke stated, "Per the Palatine desk they said that she was very difficult to understand, but they heard the word 'suicide' several times and when they asked her if she was thinking about suicide she said she's been very depressed." She also does not dispute that the dispatcher advised Officer Santoro, as he attempted to gain access to plaintiff's building, that plaintiff "just hung up on the desk clerk." Def.'s L.R. 56.1 Stmt., Exh. E. Indeed, my own review of the audio recordings confirms these statements, and further confirms that the Palatine desk officer had indeed told the dispatcher that plaintiff "sounded like she made suicidal comments," Pl.'s Exh. 8 at 11:14-15, and specifically that she had said, "sometimes I think about suicide." *Id*. at 11:45-47.

While I agree that plaintiff did not, in fact, use those words in her call to the Palatine Police, there is no dispute that the officers were told by dispatch that she had done so, or that she had abruptly terminated her call to the police. "An officer may reasonably rely on information provided by other officers" in assessing whether probable cause for an arrest exists. *Duran v. Sirgegas*, 240 Fed. Appx. 104, 114 (7th Cir. 2007) (citing *Martinez v. Simonetti*, 202 F.3d 625, 634 (2nd Cir. 2000)). Accordingly, the officers had an objectively reasonable belief based on the dispatcher's statements that she was in immediate danger at the time they entered her home.

Moreover, while it is true that in their ensuing conversation, plaintiff denied an intent to harm herself, the overall circumstances in which defendants found plaintiff confirmed much of the information defendants had received from dispatch, and, coupled with that information, supported a reasonable belief that she required involuntary mental health commitment. Although plaintiff claims not to have been intoxicated, she does not dispute that defendants believed her to be so based not only on the dispatch report, but also on their observation of her and of her environment. Plaintiff also does not dispute that she told defendants that she wanted to talk to her social worker, nor does she controvert evidence that told them she was upset about a range of other issues,

including the order of protection her ex-boyfriend had obtained against her.

"[P]robable cause to hospitalize a person against that person's will exists where the facts and circumstances within the police officers' knowledge and of which they had reasonably trustworthy information are sufficient in themselves to warrant an individual of reasonable caution in the belief that an immediate danger exists of the person hurting herself or others." *Threlkeld v. White Castle Systems, Inc.*, 201 F. Supp. 2d 834, 842 (N.D. Ill. 2002) (citation omitted). Furthermore, "the probable cause inquiry 'does not require that [an] officer's belief be correct or even more likely true than false, so long as it is reasonable.'" *Id*. at 843 (quoting *Qian v. Kautz*, 168 F.3d 949, 953 (7th Cir. 1999)). Other than plaintiff's denial of an intent to hurt herself, which defendants had reason to question based on conflicting information they had received from dispatch, the undisputed evidence supports a reasonable belief that plaintiff was depressed and posed an immediate threat to herself and could not safely be left alone in her home. When plaintiff was unable to reach anyone to stay with her, defendants reasonably concluded that they had probable cause to have her involuntarily committed.

But even if I were to conclude, notwithstanding the foregoing, that defendants lacked probable cause, either for the warrantless entry into plaintiff's home or the seizure of her person, I would

9

nevertheless conclude that they are entitled to qualified immunity for these actions. The qualified immunity analysis requires me to ascertain not whether defendants in fact had probable cause, but whether they had "arguable probable cause," which is to say, whether "a reasonable police officer in the same circumstances and with the same knowledge...as the officer in question *could* have reasonably believed that probable cause existed in light of well-established law." *Williams v. Jaglowski*, 269 F.3d 778, 781 (7th Cir. 2001)(emphasis and ellipses in original)(quoting *Humphrey v. Staszak*, 148 F.3d 719, 725 (7th Cir. 1998)). Plaintiff does not dispute that the "exigent circumstances" exception to the Fourth Amendment's prohibition against warrantless entries and seizures is well-established. Even if I concluded that defendants' belief that the doctrine applied in this case were mistaken, it cannot be said that the belief was objectively unreasonable in light of the information defendants had at the time. *See Humphrey*, 148 F.3d at 725 ("Officers are entitled to summary judgment on qualified immunity grounds if their actions were not objectively unreasonable at the time they were taken."). *See also Holzman v. City of South Bend*, No. 05 CV 316, 2006 WL 2788587, at *3 (N.D. Ind. Sept. 25, 2006) ("The officers were placed in the difficult position of being told by their dispatcher that Mr. Holzman was 'contemplating suicide,' versus believing his statements that he had no intention of hurting himself. The doctrine of qualified immunity allows

officers the ability to make such difficult decisions as part of effectively performing their duties.") (Citation omitted)

As for plaintiff's excessive force claim, which is analyzed under the Fourth Amendment's "objective reasonableness" standard and looks to the particular facts and circumstances of the case, *Graham v. Connor*, 490 U.S. 386, 388, 396 (1989), defendants argue that the force they used was de minimis and no more than reasonably required, citing *Beshears v. Winters*, No. 09 C 2017, 2011 WL 165188, at *7 (C.D. Ill. Jan. 18, 2011) (McCuskey, CJ.) (use of arm-bar control technique "inherently de minimis in nature"), and *Jones v. Charter Township of Genesee*, No. 09 C 11211, 2010 WL 3905374, at *5 (E.D. Mich. July 28, 2010) (Majzoub, MJ) (use of wrist lock to restrain resisting subject not unreasonable), *report and rec. rejected in part on other grounds*, 2010 WL 3906366 (E.D. Mich. Sept. 27, 2010). I agree that this is the only conclusion reasonably supported by the record.

Plaintiff concedes that the reasonableness of the force used is a legal issue where no material facts are in dispute. In this case, there is no dispute that plaintiff fiercely resisted defendants' efforts to place her on the gurney, or that she continued to resist until her arm was broken. Moreover, there is no evidence that defendants used any force greater than an "arm-bar," a "wrist lock," or a handcuff on plaintiff's right wrist to secure her. Plaintiff insists that *any* force the officers used was

11

unreasonable because they lacked probable cause to remove her from her home in the first place, but this argument falls with my conclusion that the officers had probable cause (or, alternatively, a reasonable belief that they had probable cause), to hospitalize plaintiff involuntarily.

Plaintiff does not meaningfully argue that the officers' use of force was excessive even assuming that they had probable cause to seize her. While it is true that a seizure supported by probable cause may nevertheless be unreasonable if, "judging from the totality of circumstances at the time...the officer used greater force than was reasonably necessary," *Brooks v. City of Aurora, Ill.*, 653 F.3d 478, 486 (7th Cir. 2011), plaintiff admits, on the one hand, that she resisted the officers' efforts to seize her, and fails, on the other, to identify any competent evidence to suggest that the officers applied any specific, unreasonable force to restrain her.

The severity of plaintiff's injury alone, while significant, does not preclude summary judgment. Plaintiff acknowledges that she does not recall how her injury was sustained, and her testimony about the moments leading up to the injury is riddled with inconsistencies. Plaintiff first testified that she attempted to free herself from the handcuff on her wrist, responding to the question, "[a]t any point in time did you ever try and pull out of that handcuff, pull your wrists out, pull your hand out?" with the

12

answer, "[o]f course I did." Fitzgerald Dep., Exh. 2 to Pl.'s L.R. 56.1 Stmt., 156:13-16. She went on to explain that she continued to try and wriggle free from the handcuff while the officers (or perhaps one officer and one paramedic) secured her by the wrist and elbow. *Id.*, 156:18-157:9, 157:22-158:8. Moments later, however, plaintiff contradicted that testimony, insisting that she did *not* try to pull her arm away from the officers at that time. I*d.*, 160:10-20. But she reversed course yet again in answer to the very next question, stating that she had "probably" taken her left hand, placed it on her right wrist, and tried to pull her right arm away from the officer or paramedic who was securing it. *Id.*, 160:21-161:2.

However these inconsistencies are resolved, however, nothing in plaintiff's testimony, or in the remainder of the record, controverts defendants' theory that it was plaintiff's forceful "jerking" of her arm in an effort to free herself from Officer Cram's grasp that precipitated the "popping" sound in her wrist, or provides a factual basis for concluding that her arm was broken in some other manner.[7] Plaintiff's reliance on *Abdullahi v. City of*

---

[7] At one point in her deposition, plaintiff alludes to officers grabbing her wrist and elbow and "snapping" her arm in half. She does not, however, identify this statement in her L.R. 56.1 submissions as evidence of how her injury occurred. In fact, plaintiff affirmatively states that she does not recall how her injury occurred, and, as noted, does not controvert defendants' explanation. Accordingly, I interpret this testimony as a description of the injury itself, rather than as factual support for any theory of causation.

13

*Madison*, 423 F.3d 763 (7th Cir. 2005), is thus misplaced. In that case, the court acknowledged that "the mere fact that an injury occurred while an individual was in police custody is not sufficient to avoid summary judgment-a plaintiff must identify the specific unreasonable conduct that caused his or her injuries." *Id*. at 770-71. The court concluded that the plaintiff had carried that burden, citing undisputed evidence that the defendant officer had knelt on the deceased plaintiff's back with chest-crushing force, coupled with competent medical evidence that the decedent died of injuries consistent with a crushing or squashing type trauma. *Id*. at 771. By contrast, plaintiff's citation to the testimony of her treating physician, Dr. Paul Orland--even assuming it were admissible as evidence of causation--comes nowhere near identifying "the specific unreasonable conduct that caused" plaintiff's injuries.[8] Accordingly, defendants are entitled to summary judgment on plaintiff's excessive force claim.

---

[8]Defendants argue that Dr. Orland's testimony is inadmissible because, among other reasons, Dr. Orland was not disclosed as an expert pursuant to Rule 26(a)(2)). But even setting the admissibility issue aside, the cited testimony does not address any specific conduct by Officer Cram (indeed, it appears that he was addressing the theory that plaintiff's injury was caused by her attempts to wriggle out of the handcuff), but merely responded, in answer to the question, "was there any way to tell whether this was a force that involved a blunt trauma or a twisting trauma?" that the nature of plaintiff's injury suggested that it "could have been a blunt or more significant type of trauma." This is simply too slim a reed, standing alone, to support the inference that plaintiff's injury was caused by any specific unreasonable conduct by defendants.

I now turn briefly to plaintiff's claims under Illinois state law for battery and for intentional inflection of emotional distress. Defendants argue that Officers Santoro and Cram are immune from liability for these claims under Section 2-201 of the Illinois Tort Immunity Act, and that paramedic Ashcraft is immune pursuant to the Emergency Medical Services ("EMS") Systems Act. Both arguments have merit.

As plaintiff acknowledges, section 2-201 of the Illinois Tort Immunity Act protects officials from liability for discretionary decisions. *Reddick v. Bloomingdale Police Officers*, No. 96 C 1109, 1997 WL 441328, at *7 (N.D. Ill. July 30, 1997)(Coar, J.). "Decisions to transport someone for medical evaluation and the proper method to transport patients to a hospital for evaluation are discretionary." *Id*. Plaintiff claims an "exception" from this provision by invoking section 2-202 of the Tort Immunity Act, which recognizes that public employees may be liable for "willful and wanton conduct" when acting "in the execution or enforcement of any law." 745 ILCS 10/2-202. This argument fails for at least the reason that defendants were acting in the capacity of community caretakers, not in the execution or enforcement of any law. Moreover, it is far from clear that the evidence taken as a whole could reasonably persuade a jury that the officers' actions amounted to willful or wanton misconduct.

As for paramedic Ashcraft, plaintiff acknowledges that he is

immune from liability under the EMS Systems unless his actions constitute willful or wanton misconduct. Plaintiff has not attributed a single act to this defendant that she claims evidences such misconduct.

Finally, plaintiff does not dispute defendants' argument that the Village of Schaumburg cannot be held liable for plaintiff's state law claims since, pursuant to 745 ILCS 10/2-109, "[a] local public entity is not liable for an injury resulting from an act or omission of its employee where the employee is not liable."

### III.

For the foregoing reasons, defendants' motion for summary judgment is granted.

**ENTER ORDER:**

_____
**Elaine E. Bucklo**
United States District Judge

Dated: January 31, 2012